**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| DONALD D. LYONS and JOAN L. | ) | |
| LYONS as Individuals, and as | ) | |
| Assignees of James F. Scott and | ) | |
| Auburn Automotive Heritage, Inc., | ) | |
| | ) | |
| Plaintiffs | ) | |
| v. | ) | Case No. 1:09-CV-348 |
| | ) | |
| TIMOTHY S. DURHAM, and | ) | |
| DIAMOND INVESTMENTS, LLC. | ) | |
| | ) | |
| Defendants | ) | |

## OPINION AND ORDER

This case is about a rigged auction for a Duesenberg automobile that was once owned by

William Randolph Hearst.  The Duesenberg's owner, Tim Durham, placed the car up for auction

at a special event at the Auburn Cord Duesenberg Museum.  But before the auction, Donald and

Joan Lyons took a shine to the car and offered to buy it from Durham for a million dollars.

Durham agreed to sell the car to Mr. and Mrs. Lyons, but still wanted to keep it in the auction.

They agreed. The plan, with the full knowledge of the Museum, was for the Lyonses to pose as

unsuspecting winning bidders at the auction.  Whatever the hammer price ended up being, they

would simply pay Durham the agreed-upon $1 million.  The auction would thus be nothing more

than a phony display.  But things didn't go as planned.  An unsuspecting telephonic bidder

named James Scott appeared on the scene and bid nearly $3 million for the car.  Scott, of course,

didn't know anything about the Durham-Lyons pre-auction agreement. But Scott's inflated bid

presented an opportunity to Lyons and Durham, who quickly agreed to split the profit from the

sale.  But the plan to profit from the rigged auction went awry when it turned out that Durham could not deliver clear title to the Duesenberg because he had used it as collateral to secure a loan for one of his many businesses.

Litigation ensued, and here's where we're at: the Lyonses, who not surprisingly were originally defendants in this action, have settled with Scott and the Museum.  As part of the settlement, Scott and the Museum assigned their claims against Durham and his company Diamond Investments to the Lyonses who now stand in their shoes.  Webster Business Credit Corporation, who held the lien on the Duesenberg, and which has asserted a number of claims against Durham and Diamond, is also still a party, but has not moved for summary judgment.

Lyons[1], as the assignee of Scott's and the Museum's claims against Durham and Diamond, has moved for summary judgment on the Third Amended Complaint [DE 220].  For the reasons below, the motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

**The Parties**

Defendant Timothy Durham is the majority member of Diamond Investments, LLC, d/b/a Diamond Auto Sales [DE 222-9 at ¶ 1; DE 223-4; DE 223-11 at ¶ 2; DE 223-12 at ¶ 2].  Durham has a checkered background. He was indicted in the Southern District of Indiana relating to the business dealings of another of his business interests, Fair Finance Company, and he was recently found guilty of conspiracy, wire fraud, and securities fraud.  *United States v. Durham*, 1:11 CR 42, Case No. 1:11-CR-0042 [DE 354].  He is presently incarcerated and awaiting

---

[1]For ease of reference, and unless otherwise needed, I will refer to the Lyonses in the singular (i.e. "Lyons") for the balance of this opinion.

sentencing [*Id.* at DE 352; DE 356].

Diamond Investments is a personal holding company and private investment tool for Durham, who was its managing member and sole owner [DE 222-2 at 5; DE 222-35 at 7]. Diamond Investments registered its certificate of organization with the state of Indiana on October 15, 1998 [DE 223-2], and filed at least one year of reports with the Indiana Secretary of State [DE 223-3]. When asked at his deposition what Diamond Investments' present business is, Durham exercised his Fifth Amendment right against self-incrimination [DE 222-2 at 16].

Diamond Auto Sales is a d/b/a/ of Diamond Investments and was in the business of buying and selling cars and had an Indiana dealer's license [DE 222-2 at 5; DE 222-9 at ¶ 3; DE 222-35 at 7; DE 223-5]. Diamond Auto Sales is defunct, but at one time, Durham's collection of cars was between 70 and 80, approximately 20 of which were Durham's personally, and the balance were held by Diamond Auto Sales for resale [DE 222-2 at 5, 16].

Donald Lyons and his wife Joan are a married couple who live in Michigan [DE 206 at ¶ 4]. In the spring of 2009, Lyons engaged Mark Hyman and his business, Hyman Ltd. Classic Cars, to help them find and purchase a Duesenberg [DE 222-15 at ¶ 3].

Auburn Automotive Heritage, Inc., also known as the Auburn Cord Duesenberg Museum, is a 501(c)(3) tax-exempt corporation whose purpose is preserving Duesenbergs and other automobiles for their historical significance; it's located in Auburn, Indiana [DE 222-10 at 2, 6, 7, 9; DE 222-11 at 4]. Durham was a Trustee of the Museum, and according to the Museum's Code of Ethics, contained in the Museum's bylaws, he held a fiduciary responsibility to the Museum [DE 222-10 at 29; DE 222-11 at 4; DE 222-12 at 4].

Webster Business Credit Corporation was the first lienholder on the title to the

Duesenberg at the time of the auction [DE 222-7].  On June 30, 2008, Durham pledged the

Duesenberg to Webster Business Credit Corporation as security for a loan to U.S. Rubber

Reclaiming, Inc., a subsidiary of Obsidian Enterprises, Inc., both of which were other Durham

business ventures [DE 222-8 at 2, 12; DE 222-9 at ¶¶ 1-2, 6-8, 10-11].

Finally, while not a party, it bears mentioning that the vehicle at the center of this

litigation is a 1929/1930 Duesenberg Model that once belonged to William Randolph Hearst [DE

222-5; DE 222-8 at 16; DE 222-19 at 12].  On the title to the Duesenberg reflecting its 2003 sale,

the car is titled to Durham [DE 222-6 at 3].  But for reasons that are not clear on the title to the

car issued on July 1, 2008, the "owner name" was Diamond Auto Sales [DE 222-7].

**Durham's Affiliation with the Museum**

Durham became involved with the Museum when the executive director of the Museum,

and its president both approached him about sponsoring a gallery at the Auburn Museum [DE

222-2 at 6; DE 222-11 at 4; DE 226-1 at 4].  Durham agreed to sponsor a gallery for $250,000

and provided some automobiles from his collection for display [DE 222-2 at 6].  The gallery was

called the Timothy S. Durham Gallery of Classics [DE 222-2 at 6].  Durham eventually became a

member of the Museum's Board of Trustees [DE 222-10 at 1].

During a meeting of the Board of Trustees on January 22, 2009, Durham, on behalf of

Diamond Auto Sales, offered to put his Hearst Duesenberg up for auction as part of the

Museum's Extravaganza event that was to take place on September 3, 2009 [DE 222-2 at 7; DE

222-11 at 4-5; DE 222-13 at 2, 4; DE 222-24 at 2; DE 223-11 at ¶ 3].  The following day,

Durham and Matt Short, Executive Vice President of the Museum, exchanged emails regarding

the Duesenberg's position in the auction [DE 222-11 at 5; DE 222-14].  Durham told Short that

4

he was "not wild about selling it" and that he would like to set the reserve price at $1 million [DE 222-14 at 2]. The Museum planned to begin marketing and promoting the Duesenberg immediately [DE 222-13 at 4; DE 222-14 at 2].

Between January and May 2009, Durham did not recall anyone from the Museum contacting him regarding filling out consignment paperwork for the auction [DE 222-2 at 7]. Short confirmed that between May and August 2009, he did not have discussions with Durham regarding the title to the Duesenberg or possible liens on the vehicle, but he did want the consignment paperwork from Durham [DE 222-16 at 6].

**Durham's Communication with Museum Staff About the Sale to Lyons and the Agreement to Sell the Duesenberg to Lyons**

Hyman, who had been retained by Lyons, located the Duesenberg while it was on display at the Museum [DE 222-15 at ¶ 4; DE 222-36 at 3]. In April or May 2009, Short told Durham that Hyman, who Durham knew from car auctions and events, had a client who was interested in purchasing the Duesenberg [DE 222-2 at 7]. At the time, Durham had no reason to believe that he did not have the right to sell the Duesenberg [DE 222-2 at 17]. Short then made arrangements for Lyons to view and test drive the Duesenberg, which was on display at the Museum with a sign promoting its place in the Extravaganza [DE 222-16 at 5]. The test drive occurred on May 14, 2009 [DE 222-15 at ¶ 5]. Short met Hyman and Lyons thereafter and they discussed the need for some repairs [DE 222-16 at 5]. Short contacted Durham and told him that Lyons liked the vehicle, and that Hyman had a list of repairs that he wanted made [DE 222-2 at 8; DE 222-15 at 5; DE 222-16 at 5]. Durham consented to making the repairs [DE 222-2 at 8; DE 222-16 at 5]. Following the visit, Lyons authorized Hyman to negotiate for the purchase of the Duesenberg [DE 222-15 at ¶ 5].

Durham and Hyman discussed the fact that the Duesenberg was scheduled to go up for auction, and that Durham wanted to leave the vehicle in the auction as a favor to the Museum [DE 222-2 at 17]. There is strong evidence that the Museum was well aware of what was going behind the scenes. Indeed, the Museum's Executive Vice President Short discussed with Durham the idea of putting a high reserve price on the Duesenberg so that if the car did not sell at auction, there was still a "deal" and the Museum would "still come out okay" [DE 222-16 at 6]. Hyman indicated to Durham that it was preferable to leave the car in the auction because Lyons had other cars that they needed to liquidate before purchasing the Duesenberg [DE 222-2 at 17].

There is additional evidence of the Museum's complicity. Durham discussed Hyman's potential buyer with the Museum's President, Robert Pass. Pass wanted Durham to leave the car in the auction. Pass also told Durham that he would discuss the situation with Hyman, Museum Executive Director Laura Brinkman, and Short [DE 222-2 at 8; DE 222-16 at 6-8]. These discussions culminated in the agreement negotiated between Durham (on behalf of Diamond Auto Sales) and Hyman, which the Lyons signed on May 21, 2009 [DE 222-15 at ¶ 7; DE 222-17; DE 223-12 at ¶ 3]. The agreement provided that the Lyons would purchase the Duesenberg for $1 million and that they had given the seller, Diamond Auto Sales, a non-refundable deposit of $100,000 [DE 222-15 at ¶ 7; DE 222-17; DE 222-36 at 3; DE 223-12 at ¶ 3].

The parties also agreed that the Duesenberg would remain at the Museum until after the auction, and that Hyman, as the Lyons' agent, "will be the high bidder on the car at the auction regardless of the hammer price but, the sale price will remain at $1,000,000.00 to Buyer" [DE 222-15 at ¶ 7; DE 222-17]. The agreement also provided that Lyons would pay the $900,000 balance to Diamond within 2 days after the auction, that Diamond would have the list of repairs

6

completed, and that Diamond would pay all Buyer/Seller fees due to the Museum as a result of the sale [DE 222-15 at ¶ 7; DE 222-17]. On July 20, 2009, there was an amendment to the sale contract, extending the period of time for payment to September 10, 2009 [DE 223-9; DE 223-12 at ¶ 3].

So the auction was planned to be a sham, and everyone seemed to know it. Indeed, the President of the Museum, Robert Pass, later told Durham that he had discussed the situation with Brinkman, Short, and Hyman, and that they were all aware that Durham had agreed to sell the car to the Lyons prior to the Auction; nonetheless, they all agreed that the car should remain in the auction [DE 222-2 at 8]. The plan was for the Museum to set the reserve price high so that the Duesenberg would not sell at the auction, and that the Lyons would then buy the vehicle from Durham pursuant to their agreement [DE 222-16 at 6-7].

All of this was fine and dandy except for one problem. Durham didn't own the Duesenberg outright; there was a lien against it, and Durham never bothered to notify Lyons or the Museum about the lien [DE 222-2 at ¶ 8].

**June 2009 Shelby County Bank Loan**

In June 2009, Durham sought to open a line of credit at the Shelby County Bank. The unsigned Loan Approval form, dated June 1, 2009, lists the Borrower as "Tim Durham and/or Diamond Auto Sales" [DE 222-19 at 2]. The form shows that the bank was to extend a $450,000 loan, secured by a "[l]ien on 1930 Duesenberg" with a collateral value of $1.5 million [DE 222-19 at 2]. On June 8, 2009, Durham wrote to the bank and said that he could not find the original title to the Hearst Duesenberg and thus would have to wait on the replacement title [DE 229-19 at 3]. However, Durham went on to say that "I actually have another duesenberg that is actually

worth more . . . over 1.5 million, even now . . . can we just substitute collateral?" [DE 229-19 at 3].  Shelby County Bank personnel expressed some concern with the fact that Durham was not able to locate the title to a $1 million car, but in theory agreed to extend Durham a $500,000 line of credit using the other Duesenberg as collateral [DE 222-19 at 18, 22-23].  The record is unclear as to whether the loan transaction was ever finalized.

**Scott's Interest in the Duesenberg and Communication with the Museum**

James Scott is a wealthy car collector from Virginia, and in August 2009, his agent called the Museum to inquire about the Duesenberg [DE 222-16 at 6].  Scott was very interested in the Duesenberg, so on August 27, 2009, he visited the Museum and inspected the car [DE 222-16 at 6-7; DE 222-20 at ¶ 2].  No one from the Museum ever told Scott about Durham's secret agreement with Lyons to sell the Duesenberg [DE 222-16 at 7].  It was clear to Short, who showed the car to Scott, that Scott was very interested in the Hearst Duesenberg and that he was likely to try to buy the car at the auction [DE 222-16 at 7; DE 222-20 at ¶ 3; DE 222-21].  After Scott left the Museum, Short emailed Durham and said that he needed Durham's signature on the consignment paperwork for the auction [DE 222-16 at 6].

After Scott's visit to the Museum and prior to the auction, Short told Pass and Brinkman that there was a serious buyer interested in the Duesenberg [DE 222-16 at 8].  In the days leading up to the auction, Short received a letter of credit from Scott for $1.5 million [DE 222-16 at 8].

**The Day of the Auction and the Consignment Paperwork**

According to Durham, at the time of the auction on September 3, 2009, he had a contract with the Lyons to sell the Duesenberg, but he had not yet transferred ownership of the vehicle [DE 222-2 at 11].  Durham did not provide the title to the Museum before the auction, and as he

had done in years past, when the Museum asked for the title on the night of the auction, he

instructed Museum staff to make arrangements to get it from his assistant [DE 222-16 at 4].

Durham says that moments before the auction, Pass presented him with a Consignment

Agreement [DE 222-2 at 9; DE 222-16 at 8; DE 222-22].  The form had already been filled for a

"1930 Duesenberg Trans Cabriolet J254," and Durham filled out the reserve amount as $1.5

million and signed the form [DE 222-2 at 9; DE 222-16 at 8-9; DE 222-22].  Durham set the

reserve amount at $1.5 million because Pass wanted him to use that amount, and Durham agreed

to do so [DE 222-2 at 9].

Short says that it was he, and not Pass, who presented Durham with the consignment

papers, and that he took Durham into a conference room so that Durham could sit and sign the

agreement [DE 222-16 at 8-9]. Short admitted that he was in a hurry and asked Durham to set the

reserve and sign the documents quickly [DE 222-16 at 9].  Short did not question why Durham

set the reserve at $1.5 million, he did not ask Durham to fill in any other information on the

form, and he did not ask Durham if there were any liens on the Duesenberg [DE 222-16 at 9].

Durham did not read the Consignment Agreement at the time that he signed it, including

the provision warranting that the seller was the sole owner of the vehicle, had the right to sell the

vehicle, and had clear title or consent of the lien holder to sell; or the provision providing that the

Consignment Agreement was a binding contract [DE 222-2 at 9, 11; DE 222-22].  Durham also

did not see the portions of the Consignment Agreement that provided space for lien amount,

lienholder name, and address [DE 222-2 at 10; DE 222-22].  Durham considered the document

important only in the sense that it set the reserve amount, and said that he filled out the form in

spite of his agreement to sell the Duesenberg to Lyons because he was "just doing what [Pass]

wanted me to do" [DE 222-2 at 9-10].  At the time he signed the Consignment Agreement, Durham did not understand the purpose of the form [DE 222-2 at 10].

Once the bidding started, the wheels of the scheme quickly came off.  Hyman was bidding on behalf of Lyons when Mr. Scott telephonically entered the scene.  As described in the Museum's press release following the auction, the room fell as silent as a "tennis match" ensued "as the crowd watched bids volley back and forth" [DE 222-24 at 2].  Mr. Scott kept bidding on the Duesenberg against Lyons (bidding through Hyman) [DE 222-15 at ¶ 9; DE 222-20 at ¶ 5; DE 226-2 at ¶ 6].  Lyons claims that he was "surprise[d]" by Scott's increasing bids, but believed that he "had to be the high bidder to purchase the Duesenberg," pursuant to his agreement he had with Durham and continued bidding as the price exceeded $1 million [DE 226-2 at ¶ 6].

As the bidding neared $3 million, the whole scheme unraveled.  Lyons was told by a museum representative that if he won the auction, he would be responsible for an 8% buyer's premium [DE 226-2 at ¶ 8].  This meant that even if he only had to pay Durham $1 million for the Duesenberg, he would still owe the Museum $240,000 ($3 million times .08).  This also was at odds with the hidden agreement he had with Durham, which provided that Durham would be responsible for the buyer's fees [DE 226-2 at ¶ 8].  At that point, despite the agreement that Lyons had entered into with Durham that they would be the winners at the auction, would only pay Durham $1 million regardless of the winning auction bid, and that Durham would pay the buyer's fees associated with the auction, Lyons grew "uncomfortable with the whole process" and stopped bidding, leaving Scott the winner with a bid of $2.9 million [DE 222-15 at ¶ 9; DE 222-20 at ¶ 5; DE 222-27; DE 226-2 at ¶¶ 8-9].  Scott also paid the Museum the mandatory

buyer's premium [DE 222-20 at ¶ 5].  Scott was never apprised of the bid rigging scheme entered into by the museum, Lyons, and Durham or that the Duesenberg was subject to a lien or security interest [DE 222-20 at ¶ 4].

Following the auction, Durham and Scott signed the Purchase Invoice and Bill of Sale [DE 222-23; DE 222-27].  The total due was $3.132 million, which included the 8% buyer's premium of $232,000 [DE 222-23].

Durham said that he did not discuss the $2.9 million sale price of the Duesenberg with Lyons or Hyman [DE 222-2 at 15].  However, Lyons claims that as soon as the auction ended, and before Lyons got up from his table, Hyman told Lyons that he would try to "work out a deal" with Durham [DE 226-2 at ¶ 10], and that at some point that evening, Hyman and Durham met and Durham felt "compelled" to give Lyons the benefit of the agreement, and agreed that if Lyons would pay the previously-promised amount of $1 million, that the Duesenberg would go directly to Scott, and Lyons and Hyman could split the remaining proceeds [DE 222-15 at ¶ 10; DE 226-2 at ¶ 10].

Durham's understanding of the transaction was that he had a "preagreement" to sell the Duesenberg to Lyons for $1 million, and that Lyons would then sell the Duesenberg to Scott [DE 222-2 at 19].  Durham would sign the title to Hyman (acting on Lyons' behalf), who would sign the title to Scott, even though Hyman did not have any agreement or arrangement with Scott [DE 222-2 at 19].

**Following the Auction**

The day after the auction, Durham attended a meeting of the Board of Directors of the Museum [DE 222-2 at 16].  Durham did not share the details of his agreement with Hyman and

11

Lyons at the meeting [DE 222-2 at 16].

The same day, Lyons and Hyman entered into an agreement for the sale of the Duesenberg [DE 223-10]. In the agreement, Lyons and Hyman agreed that a "contract exists between us to purchase the Duesenberg from Tim Durham/Diamond Auto Sales for $1,000,000," that "[a] new buyer has purchased the car for $2,900,000.00 plus buyer's premium at the ACD Auction," that they would "split all sale proceeds equally over $1,000,000 purchase price," and that the Museum would receive the buyer's premium from the sale of the car at the auction and Hyman and Lyons would "receive the hammer price of $2,900,000" [DE 223-10]. The document also included a term agreeing that "[i]f the secondary sale occurs at $2,900,000, Hyman agrees to dismiss the original $100,000 payment from Lyons on the purchase of the car" [DE 223-10].

The agreement also appeared to contemplate how Lyons would handle the tax consequences of the transaction, which he hoped to handle as a Section 1031 "like kind" exchange for tax purposes, using the proceeds from the sale of other automobiles that he had sold to purchase the Duesenberg from Diamond [DE 223-10; DE 226-2 at ¶¶ 2-4]. Prior to the auction, Lyons had worked with a company called Accruit to establish a fund for the proceeds from the sale of their race cars that would be used to purchase the Duesenberg [DE 226-2 at ¶¶ 4, 11].

On September 8, 2009, Hyman emailed Durham requesting that Durham provide wiring instructions so that Hyman could wire Durham the funds for the Duesenberg payment [DE 223-8 at 3]. Durham replied that he was under the impression, from Brinkman, that the funds were going to the Museum, and that the Museum would wire Durham "our amount" [DE 223-8 at 3].

12

Brinkman, speaking on behalf of the Museum, preferred that the money go to the Museum first [DE 222-2 at 18]. Brinkman looked to Durham for instruction because the car was still "technically" Durham's [DE 222-2 at 18]. At that point in time, Durham was skeptical that Scott would actually wire the $2.9 million for the Duesenberg [DE 222-2 at 18]. Brinkman ultimately deferred to Durham's instructions and agreed to wire the $2.9 million that it had received from from Scott to Hyman [DE 222-2 at 18]. In the same email, Durham directed Hyman to title the Duesenberg directly "from us to the buyer to avoid double sales tax" [DE 223-8 at 2]. Hyman responded and requested that Durham send the title directly "to me as the buyer. I am dealer [sic] so there is no sales tax involved. Also, because a 1031 exchange was involved with us buying the Duesenberg, title must pass thru me and I will sell it to the new buyer" [DE 223-8 at 2].

On September 9, 2009, Lyons instructed Accruit to wire the funds in their 1031 account to Hyman, and Lyons sent additional funds to Hyman from his regular bank account [DE 226-2 at ¶ 11]. Following receipt of the money, Hyman arranged for funds to be wired to Diamond Investments [DE 223-6; DE 226-2 at ¶ 11]. Lyons informed his tax advisors that the transaction would be treated as if Diamond sold the Duesenberg to Lyons, who then sold it to Scott, and Lyons was advised that this would be permissible if the proceeds were then used to purchase another vehicle [DE 226-2 at ¶ 13]. Later the same month, Lyons purchased a different Duesenberg [DE 226-2 at ¶ 13]. On his tax forms, Lyons represented that he had sold the Duesenberg to the Museum and received $1,950,000, and that he had a 100% ownership interest in the Duesenberg at the time he sold it, which they represented was September 3, 2009 [DE 223-7]. However, Lyons now claims that it was "clear that the deal had to be directly between

Mr. Durham and Mr. Scott," that Lyons did not own the Duesenberg at the time of the auction, and that he did not sell the Duesenberg to Scott [DE 226-2 at ¶ 14]. Lyons denies that he was ever the owner of the Hearst Duesenberg [DE 226-2 at ¶¶ 14-15].

**The Title to the Duesenberg**

As it turned out, as noted above, Durham didn't own the Duesenberg outright; it was in fact subject to a lien held by Webster Business Credit Corporation, and Durham never disclosed this to any of the parties involved in the transaction [DE 222-2 at 20]. At the time of the auction, the title to the Duesenberg identified Diamond Auto Sales as the owner and Webster Business Credit Corporation as the first lienholder [DE 222-2 at 20]. Webster perfected its security interest in the Duesenberg and had possession of the title [DE 222-2 at 20].

Following the auction, the Museum's Vice President, Short, communicated with Durham repeatedly in an attempt to acquire the title to the car [DE 222-16 at 10-11]. On Friday, September 11, 2009, Short emailed Durham and requested that Durham send the title to him or Scott, and provided Scott's mailing address [DE 222-25 at 2; DE 226-5 at 2]. Durham responded that his assistant was out of town and they would locate the title the following week [DE 222-25 at 2; DE 226-5 at 2]. Durham also requested that Short send Durham the auction form, signed by Scott, with the amount of the sale [DE 222-25 at 2; DE 226-5 at 2]. Short replied that there was not a signed form because the bid was over the phone, but that the Museum had received the money [DE 222-25 at 2; DE 226-5 at 2]. On September 16, 2009, Short again emailed Durham, as well as Durham's assistant, and requested the title to the Duesenberg [DE 222-26 at 2; DE 226-5 at 3]. Durham replied that his assistant would "locate and send" [DE 222-26 at 2; DE 226-5 at 3]. Short emailed Durham's assistant again on

14

September 21, 2009, requesting the title, and she responded that she had been out of the

Indianapolis office and that she would locate it the following weekend when she returned [DE

226-5 at 4]. On September 28, 2009, Short again requested the title from Durham's assistant,

and she said that she had been unable to find it and that she had ordered a replacement [DE 226-

5 at 5]. At this point it became clear that Durham was just giving them the run around.

Durham claims that at the outset of the litigation, he was not aware that Webster Business

Credit Corporation held the title to the Hearst Duesenberg [DE 222-2 at 20]. In August 2009,

Webster and Durham corresponded about substituting a different vehicle for the Duesenberg on

which Webster had a lien [DE 223-13 at 2; DE 226-4 at 9].[2] As early as June 2009, Webster

received an appraisal for another Duesenberg, J-116, but it is unclear from the record whether

the appraisal was provided for the purpose of possibly substituting the J-116 as collateral for the

Hearst Duesenberg, or if it was simply in connection with securing existing debt [DE 226-4 at 3].

On August 28, 2009, Alan McKay at Webster wrote an email to Durham, apologizing for his

failure to promptly respond to Durham's letter of August 19th, regarding an appraisal report [DE

223-13 at 2; DE 226-4 at 9]. It is unclear from the email what the appraisal he referred to was

_____

[2]After his deposition, Durham executed an affidavit that was appended to his response to the motion for summary judgment [DE 223-11]. The affidavit averred that at the time of the auction, Durham knew that Webster had a security interest in *a* Duesenberg he owned, but that he did not know *which* Duesenberg, and that when he discovered that the lien was against the Duesenberg that is the subject of this litigation, he attempted to swap the collateral so that he could clear the title [*Id.*]. Lyons filed a motion to strike these paragraphs of the affidavit because they were the subjects of questions asked at a deposition, to which Durham asserted his Fifth Amendment rights [DE 224]. Durham did not respond. Because a litigant may not use the Fifth Amendment as a shield to protect himself from cross-examination, *see U.S. v. All Assets and Equipment of West Side Bldg. Corp.*, 843 F. Supp. 377, 382-83 (N.D. Ill. 1993) (defendant who takes the stand on his own behalf cannot escape cross-examination by then taking the Fifth), I will grant the Lyons' unopposed motion to strike [DE 224]. However, the remaining documentary evidence submitted by the parties indicates that Durham corresponded with Webster regarding an attempt to swap Duesenbergs in August 2009.

for, but in the email McKay did write that "we would consider a swap of another car depending on its value," pursuant to certain conditions [DE 223-13 at 2; DE 226-4 at 9]. Following the auction, on October 7 and 8, 2009, Durham further corresponded with McKay about substituting the collateral for the Webster loan, and offered to pay "capital . . . to pay off the term debt of 375k and you release the [D]uesenberg" [DE 222-28 at 2; DE 226-4 at 12]. Durham also offered "a series of autos" as collateral for his loan from Webster [DE 222-28 at 2-3; DE 226-4 at 12-13]. The Duesenberg that Durham attempted to substitute had a higher value than the Hearst Duesenberg, so Durham thought that Webster would be likely to accept the offer [DE 223-11 at ¶¶ 7-8]. However, Webster declined to do so, and Durham ascribes this to the fact that the Hearst Duesenberg was sold for an artificially high amount at the auction [DE 223-11 at ¶ 9]. Lyons agrees that the $2.9 million valuation represented an "artificially – although accidentally – inflated" price for the car [DE 226-2 at ¶ 18].

On the same day as he corresponded with McKay at Webster regarding the proposed Duesenberg swap, Durham emailed Short and said that "we are tracking down the lost title. do [sic] you have anything showing the sale eviding [sic] amt buyer etc that u can scan and email to me" [DE 222-29 at 2]. On October 9, 2009, Jan Schippers, Business Manager for the Museum, wrote to Durham's assistant again asking about the title [DE 222-30 at 2]. Durham's assistant replied that she was unable to locate the title, so she had requested a duplicate/lost title [*Id.*]. The application for replacement title, which is not dated, listed Webster Business Credit Corporation as the first lienholder [DE 223-15].

In November 2009, Short again emailed Durham and his assistant looking for information regarding the title, because he had been contacted by Scott's attorney who was

16

rightfully "quite concerned about the title for the Duesenberg" [DE 222-31 at 3].  Short indicated

that a replacement title should only have taken 10 days to acquire [DE 222-31 at 3].  Durham

replied the following day, November 13, 2009, that "we finally figured out where the title has

been," that it had been in the possession of "the bank" because the Duesenberg had been used as

collateral to secure a loan, and that the replacement title had been sent to the bank [DE 222-31 at

3].  However, Durham assured Short that Durham had "contacted the bank and they are going to

substitute collateral and give me the title back . . . sorry for the delay i just hadnt even

remembered this collateral issue.  but there will be no problem getting the title back" [DE 222-31

at 3].  Durham also instructed Short to have Scott's attorney call Durham directly to discuss the

title issue [DE 222-31 at 3].  Short forwarded Durham's email to Scott's attorney the same day,

but a week later, Scott's attorney wrote back to Short that he had attempted to contact Durham

and received no reply, and that the title had still not been delivered [DE 222-31 at 2].

 The Museum shipped the Duesenberg to Scott, but despite numerous requests, he never

received the title to the car [DE 222-20 at ¶ 6].

**Durham's Knowledge Regarding the Lien on the Duesenberg**

 During his deposition, Durham was asked repeatedly about what he did to secure the title

to the Duesenberg, if or when he made efforts to obtain the title to the Duesenberg, and his

knowledge of Webster's lien on the Duesenberg [DE 222-2 at 6, 7, 8, 10, 11, 12, 13, 15, 16, 19,

20; *see also* DE 224; DE 225 at 1-7].  Each time he was asked these questions, he asserted his

Fifth Amendment right against self-incrimination [*Id.*].  Durham denied that he was made privy

to email communications between his assistant and Matt Short regarding the search for the title

to the Duesenberg [DE 222-2 at 12-13].  Durham was shown email correspondence between

himself, his assistant, and Short regarding the search for the title to the Duesenberg, and he asserted his Fifth Amendment rights when he was asked questions about the emails [DE 222-2 at 13].

Durham also asserted his Fifth Amendment rights when he was asked what Diamond Investments' current business is [DE 222-2 at 16].

**Settlement and Assignment of Claims**

Scott gave up trying to secure the title to the Duesenberg informally and filed this lawsuit against all parties involved: Durham, Diamond Investments, Lyons, Hyman, and the Museum [DE 1].  A bevy of cross-claims and counterclaims were also brought. Eventually, the Museum and Scott settled their claims with Lyons  [DE 222-15 at ¶¶ 14-15; DE 222-32; DE 222-33; DE 222-34; DE 226-2 at ¶ 19].  As a result of those settlements, the Museum and Scott assigned their claims against Durham and Diamond to Lyons [DE 222-15 at ¶¶ 14-15; DE 222-32; DE 222-33; DE 222-34]. So under the now operative Third Amended Complaint, neither the Museum nor Scott are parties to the case any longer; but their claims remain and are being prosecuted by Lyons [DE 206].  It is these claims, as well Lyons' own claims, that I now address in the pending motion for summary judgment.

## DISCUSSION

Lyons asserts claims against Durham and Diamond for breach of contract, unjust enrichment, breach of implied warranty of title, actual fraud, constructive fraud, relief under the Crime Victim's Relief Act, the Indiana Consumer Protection Act, and alter ego.  I take up each of these claims below.  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986).

## I.      Breach of Contract

In Counts I and II of their Third Amended Complaint, Lyons asserts that Durham and

Diamond are liable to both Lyons (Count I) and to Scott (Count II) for breach of contract [DE

206]. Because Lyons has been assigned Scott's claim against Durham and because Lyons

concedes that he can recover "only once" on the breach of contract claim [DE 221 at 3, n.1], I

will limit my discussion to Scott's claim against Durham and Diamond that has been assigned to

Lyons.

Construction of a written contract is a question of law for the trial court for which

summary judgment is particularly appropriate. *Noble Roman's Inc. v. Pizza Boxes, Inc.*, 835

N.E.2d 1094, 1098 (Ind. App. 2005); *Orr v. Westminster Village North, Inc.*, 689 N.E.2d 712,

721, n.16 (Ind. 1997). This is especially true when a contract is unambiguous, and the Court

must simply enforce the terms of the agreement. *Skrypek v. St. Joseph Valley Bank*, 469 N.E.2d

774, 777 (Ind. App. 1984). As the Seventh Circuit has explained, "[i]nterpreting contractual

language is a job for the court when no parol evidence bears on its meaning." *Biomet*

*Orthopedics, Inc. v. Tact Med. Instruments, Inc.*, 454 F.3d 653, 655 (7th Cir. 2006) (construing

Indiana law).

The elements of a breach of contract action under Indiana law are: 1) the existence of a

contract, 2) the defendant's breach of the contract, and 3) damages. *Breeding v. Kye's, Inc.*, 831

N.E.2d 188, 190-91 (Ind. App. 2005). Under Indiana law, "rights attached to a contract,

including the right to sue for breach of contract," are assignable. *Essex v. Ryan*, 446 N.E.2d 368,

374 (Ind. App. 1983).   So Lyons is permitted to assert the breach of contract claims of Scott and

the Museum against Durham and Diamond.

There is no question that there was a contract between Tim Durham, the Museum, and

Scott: the Consignment Agreement clearly states that "[t]his instrument together with the

Bidder's Registration Card, Clerk Ticket and Purchase Invoice & Bill of Sale compromise [sic]

the entire agreement of the parties and shall be binding on them . . . .  The above instruments

constitute a contract between the Buyer, Seller/Owner and Kruse"[3] [DE 222-22 at 3, ¶ 12].

Similarly, the Bill of Sale provides that "[t]his instrument together with the Bidder's Registration

Card, Clerk Ticket and Consignment Information and Selling Agreement, Odometer Statement,

Buyer's Guide and any other document signed by one or both of the parties and notices posted at

the sale site comprise the entire agreement of the parties and shall be binding on them . . . [t]he

above instruments constitute an agreement between the Buyer, Seller/Owner and Kruse" [DE

222-23 at 3, ¶ 15].

Scott signed the Bidder's Registration Card [DE 222-21].  Following the auction, the

clerk completed a Clerk Ticket indicating the winning bid: $2,900,000 by Mr. Scott [DE 222-

37].  And Durham, without reference to Diamond Auto Sales or Diamond Investments, signed

the Consignment Agreement, just underneath the words "By signing this agreement, I accept and

agree to be bound by all the provisions herein, including provisions on the reverse side.  I have

reviewed all of the above information and it is all correct" [DE 222-22 at 2].  The Consignment

Agreement also stated, in large capital letters, "THIS AGREEMENT IS A LEGAL AND

[3]The forms use "Kruse" in lieu of "The Auburn Cord Duesenberg Museum," who was acting as
the auction house.  Lyons notes that the Museum was using forms from another auctioneer, Kruse, and
that wherever the forms state "Kruse," it should be interpreted as meaning the Museum [DE 221 at 4,
n.3].  Neither Durham nor Diamond object to this characterization.

BINDING CONTRACT.  SEE REVERSE SIDE FOR IMPORTANT ADDITIONAL PROVISIONS" [*Id.*].  The Purchase Invoice and the Bill of Sale, indicating the $2.9 million purchase price, was signed by Scott as the Buyer and Durham as the Seller [DE 222-23 at 2].  Again, Durham signed his own name, without reference to Diamond Auto Sales or Diamond Investments.

Durham argues in his brief that there is a question of fact regarding whether or not privity of contract existed between Mr. Scott and Diamond Auto Sales, because all of the documents "were in the context of an already agreed upon sale to Mr. Lyons and thus provide no support for a claim for liability against Diamond of Mr. Scott" [DE 223-8].  In other words, Durham is attempting to use the Lyons/Durham pre-auction agreement to create an issue of fact regarding the ownership of the vehicle at the time of the auction, but this misunderstands the concept of privity of contract.

As to the legal issue, the general rule is that only parties to a contract, or those in privity with the parties to the contract, have rights under the contract.  *OEC-Diasonics, Inc. v. Major*, 674 N.E. 2d 1312, 1314-15 (Ind. 1996).  Privity of contract functions to prevent a third party from suing to enforce a contract that he is not a party to, unless the contracting parties very clearly intended the contract to "protect him under the agreement by the imposition of a duty in his favor." *Id.*  This is not the issue that is present here: no third party is attempting to claim that a contract be enforced to his benefit.  Durham made an agreement with Lyons to sell the Duesenberg, and then subsequently made an agreement with Scott and the Museum to sell the very same vehicle; these are two separate agreements.  That Durham agreed to sell something that he didn't own does not bear on the issue of privity of contract.  In other words, just because

Durham engaged in pre-auction shenanigans with Lyons does not mean that he wasn't in privity of contract with Scott.  On the contrary, the contract documents prove that Durham, the Museum, and Scott were in privity.

As to the factual issue, Durham's argument that there are unresolved issues of fact as to who had ownership of the Duesenberg at the time of the auction is a similar red herring. Whether Durham had "pre-sold" the Duesenberg to Lyons at the time of the auction is a distraction.  The simple fact of the matter is that he promised to provide clear title to the buyer in exchange for the price the car fetched at the auction, and he didn't do it.  Whether Durham secretly promised the car to someone else prior to the auction is neither here nor there.

Given the existence of the contract documents, there is no question that a contract existed for Durham to consign the automobile to the Museum, for the Museum to transfer the automobile to Scott as the winning bidder, and for Scott to pay to the Museum the amount of his bid.  I find therefore that a contract existed.  Moreover, Durham signed all of the contract documents in his individual capacity, with no reference to Diamond Auto Sales or Diamond Investments [DE 222-22; DE 222-23].  In contrast, he signed the agreement to sell the Duesenberg to the Lyons in his capacity as President of Diamond Auto Sales [DE 222-17]. Because Durham inserted himself into the transaction with Scott in his personal capacity, and never represented to Scott in any way that he was acting on behalf of Diamond Investments, Durham – and not Diamond Investments – is the proper party to the contract here.

The next question is whether there was a breach.  "A party is guilty of a breach of contract when either he places himself in such a position that it is beyond his power to perform his part of the contract or if he fails to perform all the obligations which he agreed to undertake."

22

*Ind. Gas & Water Co. v. Williams*, 175 N.E.2d 31, 34 (Ind. App. 1961).  In this case, the

Consignment Agreement and Bill of Sale explicitly provide that the Seller/Owner (Durham)

warranted that he was the sole and only owner of the vehicle; that he had the right to sell the

vehicle and possessed clear title or consent of the lien holder to sell the vehicle; that he had

provided the Museum with all lien holder information in advance of the sale; that he agreed to

provide the Buyer with good, clear, accurate, and merchantable title; and that he agreed to

correct any title defects or pay the costs to provide the Buyer with "good, clear and merchantable

title" [DE 222-22 at 3, ¶ 2; DE 222-23 at 3, ¶ 2].  Again, Durham signed both of these

agreements, without reference to Diamond Auto Sales or Diamond Investments.

　　But the record is clear that Durham did not have good title: Webster had a lien on the

Hearst Duesenberg.  Durham did not have permission to sell the Duesenberg without Webster's

consent, and Durham did not disclose to the Museum or to Scott that Webster had a lien on the

vehicle.  In fact, on the Consignment Agreement, Durham failed to provide any information in

the blanks for "Lien Amount" or "Lien Holder Name & Address."  And at no point has Durham

corrected the title defects to provide Scott with clear title to the vehicle.  So Scott paid the full

$3.1 million for the Duesenberg, but Durham never transferred good title to him.  This is plainly

a breach.

　　Durham argues that he is not liable for the breach of the contract because he did not

know that he did not have clear title to the Duesenberg at the time he signed the Consignment

Agreement, because he owned so many Duesenbergs and other automobiles that it was simply

not feasible for him to mentally keep track of their ownership.  While Durham's mental state is

relevant to the fraud claims against him (and more on that in a moment), it matters not as to

whether he breached the contract.  In contract cases, the breaching party's state of mind is "of no moment," other than in cases where punitive damages are sought.  *Burleson v. Illinois Farmers Inc. Co*, 725 F. Supp. 1489, 1495 (S.D. Ind. 1989), citing *Peterson v. Culver Ed. Found.*, 402 N.E.2d 448, 458 (Ind. App. 1980).  Whether Durham breached the contract knowingly or unknowingly is simply not relevant to resolution of this breach of contract claim.

Durham also argues that Lyons may have somehow perpetrated a tax fraud, and should thus be estopped from asserting Scott and the Museum's breach of contract claims against Durham [DE 223 at 9].  Durham's argument is that Lyons' tax treatment of the money that he received from the transaction was somehow fraudulent, and that estoppel bars him from standing in the shoes of Scott for purposes of the breach of contract claim.  But Durham improperly applies the doctrine of estoppel: even assuming, for purposes of this motion only, and despite the absolute dearth of evidence in the record, that the Lyons had somehow committed tax fraud as a result of the transaction, Durham would not be entitled to estoppel here.

Nothing in *Paramo v. Edwards*, 563 N.E.2d 595, 598 (Ind. 1990), the case upon which Durham principally relies, mandates such a result.  *Paramo* addressed the applicability of equitable estoppel to avoid a statute of limitations defense based on the insurer's behavior in encouraging the plaintiffs to avoid filing suit, which has no bearing on this case. Durham cites no authority for his claim that Lyons should somehow be estopped from asserting Scott's breach of contract claim against Durham.  Lyons' tax activities have no effect upon the assignment of Scott's claim.

That leaves only the question of damages.  In a breach of contract case, the recoverable damages are generally limited to actual damages suffered.  *Merrillville Conservancy Dist. ex rel.*

24

*Bd. of Directors v. Atlas Excavating, Inc.*, 764 N.E.2d 718, 724 (Ind. App. 2002). "Actual

damages include those reasonable expenses that are a natural consequence of the breach." *Id.*

Under Indiana law, "the alleged breach must be a cause in fact of the plaintiff's loss," and "[t]he

test of causation in common law contract actions is not whether the breach was the only cause

. . . but whether the breach was a substantial factor in bringing about the harm." *Fowler v.*

*Campbell*, 612 N.E.2d 596, 601-02 (Ind. App. 1993); *see also Parke State Bank v. Akers*, 659

N.E.2d 1031, 1034-35 (Ind. 1995).

Lyons asserts that the damages on the contract claim are $1 million, which is the net loss

that Scott has suffered: although he paid $3,132,000 to the Museum for the Duesenberg,

$2,132,000 has been returned to Scott by Lyons, Hyman, and the Museum [DE 221 at 6, n.4].

The outstanding $1 million that they seek here is the $1 million from the proceeds of the sale that

Durham received in exchange for the Duesenberg, which he has not returned.

Durham again tries to create an issue of fact where there is none: Durham asserts that he

was not the cause of the breach. Rather, he claims that it was the Lyons' agent, Hyman, who

actually caused the damages suffered here, because Hyman was the person responsible for

"illegally bidding up the car with Mr. Scott," which in turn prevented Durham from being able to

substitute another Duesenberg from his collection as collateral for his loan from Webster, in

place of the Hearst Duesenberg. Durham's claim that he "may have been able to provide a clear

title to Mr. Lyons had Mr. Lyons not bid the price . . . above its understood value" [DE 223 at

12] borders on the outrageous. The most "substantial factor in bringing about the harm" in this

case was Durham's actions: Durham agreed to put the Hearst Duesenberg in the auction, he

agreed to sell it to Lyons, he agreed to proceed with the auction despite the pre-sale, and he

signed documents indicating that he could pass clear title to the Duesenberg to whomever the high bidder was at the auction – when he could not do so. These undisputed facts show that Durham was the party responsible for breaching the contract.

For these reasons, Lyons' motion for summary judgment on Scott's breach of contract claim against Durham is **GRANTED**.[4]

## II.     Actual and Constructive Fraud

Lyons also moves for summary judgment on his claims of actual fraud and constructive fraud. It is exceedingly difficult for a *plaintiff* to obtain summary judgment on a fraud claim. And this case is no different. Lyons' summary judgment motion on both claims will be denied.

### A.     Actual Fraud

To prove actual fraud, a plaintiff must offer evidence of 1) a material misrepresentation of past or existing fact by the party to be charged, which 2) was false; 3) was made with knowledge or in reckless ignorance of the falsity; 4) was relied upon by the complaining party, and 5) proximately caused the complaining party injury. *Pugh's IGA, Inc., v. Super Food Svcs., Inc.,* 531 N.E.2d 1194, 1197 (Ind App. 1988).

The actual fraud claim hinges, then, on Durham's mental state at the time of the auction. Lyons claims that Durham knew, at the time of the auction, "that he had pledged the Automobile to Webster and that Webster was holding the title" [DE 221 at 10]. At his deposition, Durham repeatedly invoked the Fifth Amendment when asked about Webster's lien. Essentially, any time a question was posed regarding his knowledge of Webster's lien on the car, he asserted his

---

[4]In the alternative to their breach of contract claim against Durham and Diamond, Lyons has asserted claims for unjust enrichment and the implied warranty of title. Because these claims are pleaded in the alternative to the breach of contract claim on which I am granting summary judgment, I need not discuss them, and they will be dismissed.

Fifth Amendment right and did not answer the question.  Lyons urges me to construe Durham's assertion of his Fifth Amendment right against self-incrimination as evidence that he "knew on the night of the Auction that he did not have the power to deliver title free and clear" [DE 221 at 11].  In fact, Lyons argues that this is the "only possible inference" from Durham's testimony [*Id.*].

It is true that unlike in criminal cases, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."  *Harris v. City of Chicago*, 266 F.3d 750, 753 (7th Cir. 2001), citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).  But I am not required to draw that negative inference.  *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993).  In cases where there is a "mountain of circumstantial evidence" regarding the defendant's mental state, and the defendant asserts his Fifth Amendment privilege and therefore "cannot testify to [his] state of mind," the circumstantial evidence can be "reinforced by the inference (permissible in a civil case) of guilt from [his] refusal to testify."  *SEC v. Lyttle*, 538 F.3d 601, 603-04 (7th Cir. 2008).  But conversely, I cannot take silence alone as an admission of guilt: such an inference in the absence of other evidence is forbidden.  *LaSalle Bank v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995).

Lyons argues that the fact that Durham pledged the automobile to Webster in June 2008 – well before the auction – and the fact that he attempted to offer the vehicle as collateral for a line of credit from Shelby County Bank, but then attempted to swap in different collateral, compel a finding that Durham knew that he could not pass good title to the Duesenberg [DE 221 at 10-11].  Essentially, Lyons asks me to infer, based on the circumstantial evidence that Durham changed

his mind about using the Hearst Duesenberg as collateral for the Shelby County Bank loan, coupled with his refusal to answer questions about his knowledge on the night of the auction, that Durham knew about or recklessly disregarded the existence of Webster's lien when he consigned the car.

Lyons also points to Durham's Answer which indicates that Durham knew about the existence of the lien on the night of the auction [DE 226 at 5-6; DE 79 at ¶ 20]. But this overlooks the fact that the Amended Complaint – which was filed by Scott – is not the complaint upon which Lyons is proceeding. The Third Amended Complaint, which was filed by Lyons following their settlement with the Museum, Hyman, and Scott, presently controls [DE 206]. In response to the allegations contained therein, Durham and Diamond have made no such admissions [DE 217 at ¶¶ 59, 82, 96].

On summary judgment, Durham is entitled to have the evidence viewed in the light most favorable to him, and to have all inferences drawn in his favor. In considering the evidence, I find that it is possible that Durham did not know that the Hearst Duesenberg was subject to Webster's lien on the night of the auction. There are quite simply disputed factual issues regarding Durham's mental state at the time of the auction, precluding me from finding that Durham intentionally defrauded Scott, Lyons, or the Museum. Durham owned a number of automobiles and multiple Duesenbergs [DE 222-19 at 9]. He was a businessman with many balls in the air, and it is entirely possible that the financial strings tied to one of the many cars that he owned escaped his recollection. Durham was dealing with financial transactions on the order of millions of dollars on a regular basis, and Webster's lien on this particular Duesenberg may well have escaped his notice. What's more, Durham's post-auction behavior, including

28

contacting the Indiana Bureau of Motor Vehicles in an attempt to obtain a replacement title, is evidence that he did not know that Webster had possession of the title.

Viewing the evidence in the light most favorable to Durham, I cannot say that there is sufficient evidence to show that Durham signed the consignment agreement knowing that he did not have good title to the car. A jury might well think that he did. But there is evidence to the contrary, and a reasonable jury could readily find that Durham was just sloppy and absent-minded. So while his statements that he could deliver clear title to the car were plainly false, whether he made those statements knowing them to be false will be for a jury to determine.

### B.     Constructive Fraud

Lyons also asserts that Durham committed constructive fraud against the Museum, by virtue of the fact that Durham was a member of the Board of Trustees of the Museum and thus owed the Museum a fiduciary duty [DE 221 at 13]. This is one of the assigned claims that Lyons obtained from the Museum.

Constructive fraud is "premised on the understanding that there are situations which might not amount to actual fraud, but which are so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent." *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 323-24 (Ind. App. 1991). The elements of constructive fraud are: 1) a duty owed to the plaintiff by the defendant arising from their relationship; 2) a violation of that duty by deceptive material misrepresentations or by silence when a duty to speak exists; 3) reliance by the plaintiff; 4) injury proximately caused by that reliance; and 5) the defendant's gaining of an advantage at the plaintiff's expense. *Rice v. Strunk*, 670 N.E.2d 1280, 1284 (Ind. 1996). At the summary judgment stage, the plaintiff has the burden of proving both the existence of a duty owed to it

stemming from their relationship and the gaining of an advantage by the defendant at the expense of the plaintiff. *Heaton & Eadie Prof. Servs. Corp. v. Corneal Consultants of Indiana, P.C.*, 841 N.E.2d 1181, 1189 (Ind. App. 2006); *Strong v. Jackson*, 777 N.E.2d 1141, 1147 (Ind. App. 2002). "Intent to deceive is not an element of constructive fraud; instead, the law infers fraud from the relationship of the parties and the circumstances which surround them." *Sanders v. Townsend*, 582 N.E.2d 355, 358 (Ind. 1991).

The duty owed to the complaining party may arise in different ways, such as "by virtue of the existence of a fiduciary relationship, or in the case where there is a buyer and a seller, where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other." *Strong*, 777 N.E.2d at 1146. Here, Durham was a member of the Board of Trustees of the Museum, and he was subject to the Museum's Code of Conduct, which specifically states that "[t]he Board of Trustees holds a fiduciary responsibility for the museum and for the protection and nurturing of its various assets" [DE 222-10 at 29]. Moreover, directors of non-profit corporations owe fiduciary responsibilities to the corporation. *See Kirtley v. McClelland*, 562 N.E.2d 27, 38 (Ind. App. 1990) (affirming trial court's finding that non-profit corporation's directors breached fiduciary duty to corporation).

Assuming that Durham's signing of the consignment agreement (and thus, his representation that he could pass good title to the vehicle when he couldn't) would be a "deceptive material misrepresentation" or "silent when a duty to speak exists," *Rice*, 670 N.E.2d at 1284, the Museum would still not be entitled to summary judgment. Viewing the evidence in the light most favorable to Durham, as I must, Lyons (acting on behalf of the Museum) has failed to establish that the Museum relied on Durham's statements to its detriment, that it suffered an

30

injury proximately caused by Durham, and that Durham gained an advantage at its expense.

Lyons asserts that Durham obtained the benefit of $1 million through the auction, without actually passing good title to the vehicle, the Museum "footed the bill for marketing and selling the Automobile with no benefit," that it had "expended its resources – financial, human, and goodwill – in promoting and actually selling the Automobile at Auction," and that the Museum has, to its detriment, found itself embroiled in a lawsuit [DE 221 at 14-15].  Lyons also asserts that there was "a $1 million net loss when the Plaintiffs were required to return to Mr. Scott all of the money that he had sent to the Museum" [DE 221 at 15].

As an initial matter, there has been no evidence presented regarding the Museum's expense in marketing the Duesenberg for sale at the auction.  There was testimony that the Museum planned to do so, but I have not been presented with evidence showing that they did or how much was actually spent.

Moreover, and far more troubling, Lyons' arguments that the Museum has found itself out $1 million and embroiled in a lawsuit overlooks the fact that the Museum went ahead with the Auction *knowing that it was fixed.*  The Museum was in on it!  The Museum's own President encouraged it. It would defy logic to permit the Museum to claim that it was bamboozled out of money that it stood to make off of a bidder who was bidding against a party that had, with the Museum's blessing, already agreed to purchase the Duesenberg at a fixed price.

The reserve price was $1.5 million, and that was also the value that Durham had placed on the vehicle when he tried to use it to secure a loan at the Shelby County Bank.   Lyons himself admits that the $2.9 million was an "inflated" price for the Duesenberg.  So had Lyons not essentially been bidding with Monopoly money, it is highly unlikely that Scott would have

31

found himself in such a bidding war – a bidding war that drove up the amount of the Museum's buyer's premium and the money that the Museum stood to make off of the auction. It is not clear from the parties' submissions what, exactly, the Museum stood to gain from the auction if Scott *hadn't* bid on the Duesenberg, and the sale to Lyons had gone through at the agreed-upon $1 million. Lyons, now standing in the Museum's shoes, cannot point to the loss of that money as the source of injury for its constructive fraud claim against Durham.

Nor have the Plaintiffs established that Durham gained an advantage *at the expense of the Museum.* To establish a constructive fraud claim, the Plaintiffs must show that Lyons gained an advantage at the Museum's expense. *See Strong*, 777 N.E.2d at 1146-47. The Plaintiffs assert that Durham received $1 million and that he did so without having to actually sell the Duesenberg, by virtue of which he has gained an advantage at the expense of the Museum. But the evidence is that Scott agreed to pay $3.132 million, $240,000 of which was to go to the Museum as a buyer's premium. There is no evidence that the $1 million Durham kept was at the Museum's expense. To the contrary, the advantage that Durham gained was at Scott's expense, not the Museum's, because Durham profited $1 million, where Scott ended up out over $3 million with no Duesenberg to show for it. But Lyons has claimed only that Durham is liable to the Museum for constructive fraud, and not to Scott.[5] Durham has not gained his advantage at the Museum's expense.

A jury will have to determine whether the Museum has a viable constructive fraud claim against Durham. The Plaintiffs' motion for summary judgment on the constructive fraud claim

---

[5] Nor could they make out a claim that Scott has a valid constructive fraud claim against Durham, for Durham did not owe a fiduciary duty to Scott, and they have cited no case supporting the application of constructive fraud in an consignor/purchaser auction setting.

is **DENIED**.

### III.    Piercing the Corporate Veil

Although I am granting summary judgment to Lyons against Durham personally on the contract claim as discussed above, Lyons also seeks to pierce the corporate veil and hold Durham personally liable so that he can obtain damages from Durham himself, because Diamond Investments is insolvent [DE 221 at 18-19]. It is a "fundamental principle of American corporate law that corporate shareholders sustain liability for corporate acts only to the extent of their investment and are not held personally liable for acts attributable to the corporation." *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994). Limited liability encourages shareholders to invest their capital by leaving personal assets secure. *Aronson*, 644 N.E.2d at 867. This general principle has been recognized in Indiana for over one hundred years. *Aronson,* 644 N.E.2d at 867.

Because of the importance of limited liability in spurring innovation, courts in Indiana are reluctant to disregard the corporate entity and hold shareholders personally responsible. *Winkler*, 638 N.E. 2d at1232. As the Seventh Circuit has stated in a case construing Indiana law: "The burden of proof falls on the party seeking to pierce the corporate veil to establish that the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice." *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 265 (7th Cir. 1996) (citing *Aronson*, 644 N.E.2d. at 867). Because Indiana law provides similar protections to limited liability companies as it does to corporations, Indiana courts apply the same analysis to determine the personal liability of an LLC's members. *Troutwine Estates Dev. Co., LLC v.*

33

*Comsub Design and Eng'g., Inc.*, 854 N.E.2d 890, 899 (Ind. App. 2006).

The concept of piercing the corporate veil is an equitable doctrine, and the burden of proof is on the party seeking to pierce the veil. In deciding whether the plaintiff has met its burden of proof, the Indiana Supreme Court requires consideration of eight factors: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form. *Aronson*, 644 N.E.2d at 867; *Smith v. McLeod Distrib., Inc.*, 744 N.E.2d 459, 463 (Ind. Ct. App. 2000).

In their brief in support of its motion for summary judgment, the Lyons acknowledge that courts use these eight factors when considering whether piercing the corporate veil is appropriate, but do not address the application of these eight factors specifically. Rather, they argue that Diamond's corporate form was ignored and manipulated by Durham, and that that misuse would constitute a fraud. The Lyons argue that certain labels, such as when Durham referred to the Duesenberg as "my car" or his former business associate said in his deposition that "Tim is Diamond" establish that Durham was simply using Diamond Investments as an extension of himself. But conclusions are not evidence. On the record currently before me, there are far too many fact questions to determine whether to pierce the corporate veil.

For example, Lyons has offered no evidence relating to Diamond Investments' capitalization *at the time it was formed*. Inadequate capitalization means capitalization very small in relation to the nature of the business of the corporation and the risks attendant to such

businesses. *Cmty. Care Centers, Inc. v. Hamilton*, 774 N.E.2d 559, 565 (Ind. Ct. App. 2002).

The adequacy of capital is to be measured as of the time of the corporation's formation. *Id.*

There is also conflicting evidence over whether Diamond Investments maintained

appropriate corporate records. On the one hand, Durham points the Court to Diamond's

Certificate of Organization with the Indiana Secretary of State [DE 223-2], Articles of

Organization [DE 223-2], and Indiana Business Entity Report from 2007, which covers the

previous two-year period [DE 223-3]. Diamond Auto Sales was established as a d/b/a/ of

Diamond Investments and obtained a d/b/a/ certification from the state of Indiana [222-2 at 5;

DE 223-5]. These are the types of records that are required to be maintained under Indiana law.

Ind. Code § 23-18-2-4; Ind. Code § 23-18-12-11; Ind. Code § 23-18-4-8. Indiana's LLC law

requires that an LLC maintain certain documents, including tax returns, at its principal office,

but it's worth pointing out that the statute provides that "[f]ailure of the limited liability company

to keep or maintain the records or information required by this section is not grounds for

imposing liability on any member for the debts and obligations of the limited liability company."

Ind. Code § 23-18-4-8(e).

The only evidence that Lyons points me to in support of piercing the corporate veil is the

fact that Lyons requested, through discovery, corporate records for Diamond Investments, and

that they have received none. This is unsurprising, however, since the FBI raided Durham's

facilities in November 2009 and took all his records. It is true that Lyons made a document

request of the FBI to produce the books and records of Diamond, and they received none. But

since these documents were in the hands of a third party, I am reluctant to simply conclude that

they must not have ever existed and thus pierce the corporate veil because of this. The evidence

is mixed on this factor, which again favors denying summary judgment.

Another factor I am asked to consider is whether a corporate officer was engaging fraud. After all, an officer engaged in fraud cannot claim that his actions were really the conduct of the corporation and that he should be shielded from personal liability.  As the Indiana Court of Appeals has stated: "It is well-settled that a corporate officer cannot escape liability for fraud by claiming that he acted on behalf of the corporation when that corporate officer personally participated in the fraud." *Gable v. Curtis*, 673 N.E.2d 805, 809 (Ind. Ct. App. 1996).  But for the reasons addressed above, there are questions of fact that preclude me from finding that Durham's intent was, in fact, fraudulent, and from granting summary judgment on Lyons' actual fraud claim.  For the same reasons, at this stage of the litigation, where Durham is entitled to have inferences drawn in his favor, I must find that this factor counsels against piercing the corporate veil.

In short, while there is some evidence that Durham was using Diamond as his alter ego – for example, his willingness to list the Duesenberg on a personal financial document in an effort obtain a personal loan – there is also substantial evidence that Diamond adhered to the corporate form.  While it is entirely possible that Lyons will ultimately persuade me that Diamond's corporate shield should be pierced, I cannot make such a finding on the present state of the record. A trial is necessary to better flesh the matter out.

I have included my findings relating to piercing the corporate veil in this order for completeness sake.  But to repeat, I have granted summary judgment to Lyons against Durham in his individual capacity on the breach of contract claim. This holding may render moot the request to pierce the corporate veil.  The parties will need to discuss this matter in the Pretrial

36

Order that they prepare prior to trial, and be prepared to address it at the final pretrial conference.

## IV.  Indiana Crime Victim's Act

Finally, Lyons asserts that Durham committed either criminal mischief or criminal deception, allowing them to recover treble damages and attorneys' fees pursuant to the Crime Victims' Relief Act, Ind. Code § 34-24-3-1.  A criminal conviction is not a condition precedent to a plaintiff's recover under the Act, but a plaintiff has to prove by a preponderance of the evidence that the defendant committed a criminal act. *Coleman v. Coleman*, 949 N.E.2d 860, 869 (Ind. App. 2011).  Lyons asserts that Durham is liable under the Act to the Lyons, the Museum, and Scott.

As an initial matter, this claim is not assignable under Indiana law, so Lyons may not assert this claim on behalf of the Museum or Scott.  "[T]he right to collect a penalty is a personal right which is not assignable."  *Hart Conversions, Inc. v. Pyramid Seating Co.*, 658 N.E.2d 129, 131 (Ind. App. 1995).  In *Hart*, the court held that a prior version of the Crime Victims' Relief Act was a "punitive statute intended to deter the wrongdoer and others from engaging in similar future conduct," and that claims under the statute were not assignable.  *Id.*  Thus, Lyons cannot assert these claims on behalf of Scott or the Museum.

This leaves Lyons with his own claim against Durham under the statute.  Both the Indiana criminal deception statute, Ind. Code §35-43-5-3, and the Indiana criminal mischief statute, Ind. Code § 35-43-1-2, require proof that a person "knowingly or intentionally" acted in either making a false or misleading statement or deceiving another.  For the reasons discussed above regarding the denial of summary judgment on the actual fraud claim because of questions about Durham's mental state, I must deny Lyons' motion for summary judgment for  under the

Indiana Crime Victims' Relief Act.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment [DE 220] is hereby

**GRANTED IN PART** and **DENIED IN PART.**  The Plaintiffs' Motion for Summary Judgment

is **GRANTED** as to Count II of its Third Amended Complaint [DE 206], and Counts I, III, IV

and V are thus **DISMISSED**.  The Motion for Summary Judgment as to Counts VI, VII, and

VIII, and XI  is **DENIED**.  The Motion for Summary Judgment as to Count IX is **DENIED**, and

for the reasons stated above, only the Lyonses' claim in Count IX remain pending.

This matter is set for a telephonic status conference on September 13, 2012 at 10:45 AM.

As a courtesy, the Court will initiate the telephone conference by placing calls to the first

attorney listed on the docket for each party, at the phone number shown there.  If different or

additional attorneys wish to be included in the telephone conference, or a different telephone

number should be used, counsel must contact Judge Simon's Case Manager at (219) 852-6724

no later than 24 hours prior to the time the conference is to occur.

      **SO ORDERED**.
ENTERED: September 7, 2012

                                 s/ Philip P. Simon_____
                                 PHILIP P. SIMON, CHIEF JUDGE
                                 UNITED STATES DISTRICT COURT